**J. ATKINS HOLDINGS LIMITED, Plaintiff,**

v.

**ENGLISH DISCOUNTS, INC., Uncle Steve's Inc., 6th Avenue Electronics City, Inc., and John Does 1–10, Defendants.**

No. 87 Civ. 6109 (PNL).

United States District Court, S.D. New York.

Jan. 17, 1990.

As Amended Feb. 27, 1990.

Wallenstein, Wagner, Hattis & Strampel, Chicago, Ill. (Robert E. Wagner and Linda A. Kuczma, of counsel), and Anderson, Kill, Olick & Oshinsky, New York City (John E. Kidd, of counsel), for plaintiff.

Joseph H. Adams, New York City, for defendant Sixth Avenue Electronics City, Inc.

## OPINION AND ORDER

LEVAL, District Judge.

### INTRODUCTION

This is an action for trademark infringement dealing with the importation and sale in the United States of trademarked goods produced abroad. Such "parallel imports"

or so-called "grey-market" goods have been the subject of frequent litigation in recent years.

The complaint seeks declaratory, injunctive and monetary relief for trademark infringement. The plaintiff is J. Atkins Holdings Limited ("Atkins"), a Massachusetts corporation. The sole remaining defendant is Sixth Avenue Electronics City ("Sixth Avenue"), a New York corporation, which owns and operates a retail stereo and electronics store at 1024 Avenue of the Americas in New York City.[1] Sixth Avenue has filed counterclaims.

Plaintiff J. Atkins Holdings, Ltd. moves pursuant to Fed.R.Civ.P. Rule 56 for summary judgment. Defendant Sixth Avenue cross-moves (1) to dismiss the complaint pursuant to F.R.Civ.P. Rule 12(b)(6) on the grounds that the plaintiff Atkins is not the real party in interest and lacks standing to bring this action; (2) for partial summary judgment dismissing Atkins' claim for trademark infringement and related state law violations insofar as it seeks relief for infringements prior to July 2, 1987; and (3) for summary judgment that Atkins has no right to invoke the authority of the United States Customs Service to bar importation of "B & W" trademarked goods under the Tariff Act, 19 U.S.C. § 1526.

## BACKGROUND

The amended complaint alleges that Atkins, a Massachusetts Corporation, is the owner by assignment of the distinctive trademarks "B & W" and "B & W DM" used in connection with the sale of stereo loudspeakers in the United States. The "B & W" mark was registered on the Principal Register as Trademark Registration No. 1,419,023 on December 2, 1986. The "B & W DM" mark was registered on July 27, 1976 under Trademark Registration No. 1,044,689.

The history of the B & W marks is as follows: Until March 31, 1987, the English manufacturer of the loudspeakers, B & W Loudspeakers, Ltd. ("B & W-UK") owned the marks and licensed them to Misobanke International, Inc. ("Misobanke"). Misobanke distributed loudspeakers bearing the B & W marks in the United States under a 1975 licensing agreement through its unincorporated United States division, doing business under the name of B & W Loudspeakers of America ("B & W-America"). Misobanke had been the exclusive distributor of B & W trademarked goods in the United States since November 1975. It is undisputed that Misobanke's only relationship with B & W-UK is defined by the 1975 distributorship agreement.

On April 1, 1987, a Canadian company named Equity Investments Corp. ("Equity Investments") purchased (for significant consideration) the exclusive rights to the United States distributorship of B & W trademark goods. This was effected by Misobanke's assignment of its distribution agreement with B & W-UK to Equity Investments and by Misobanke's assignment of its U.S. division—B & W-America—to Equity International, Inc. ("Equity International"), a Canadian corporation under common control with Equity Investments. Equity Investments sublicensed its American rights to Equity International. Thereafter the day-to-day business operations relating to the sale, promotion and distribution of B & W loudspeakers and goods in the United States were handled exclusively by the B & W-America division of Equity International. It is undisputed that B & W-America's employees and trade practices remained under Equity International exactly as they had been when it had been a division of Misobanke. Like Misobanke, the Equity group of companies is related to B & W-UK only through the distributorship agreement.

Plaintiff J. Atkins Holding, Ltd. ("Atkins") was formed as a Massachusetts Corporation in or about March 1987. It is related to Equity Investments and Equity International through Joseph Atkins, who

---

1. The complaint also named as defendants English Discounts, Inc., Uncle Steve's Inc. and John Does 1–10. A final judgment of permanent injunction against defendant Uncle Steve's Inc.

was entered by consent on December 18, 1987. A consent decree as to defendant English Discounts, Inc. was entered on January 13, 1988.

is the sole shareholder of Atkins, and is also the President and director of Equity International, and 50% owner of Equity Investments.

On July 2, 1987, B & W–UK assigned the United States-registered trademarks to Atkins pursuant to an assignment agreement (the "Assignment Agreement") also signed by Equity International and Equity Investments. The Assignment Agreement reflects that Misobanke's right to distribute goods bearing the B & W marks had been assigned to Equity Investments which in turn assigned its rights to Equity International. The Assignment Agreement assigns the United States federal registrations for B & W marks to Atkins together with the good-will of the business in the United States. The Assignment Agreement also obligates Atkins to enter into a license agreement with B & W–America, subject to approval by B & W–UK, for the use of the marks in the United States. It provides that in the event the distributorship agreement is terminated so that B & W–America is no longer the exclusive distributor of B & W products in the United States, then the marks shall revert to B & W–UK. Thereafter, by a license agreement dated October 7, 1987, Atkins granted B & W–America exclusive responsibility for the sale and distribution of B & W trademark goods in the United States and exclusive control over advertising, quality control, and the administration of warranty and service programs.

Atkins is the registered owner of the two "B & W" marks, as certified by the United States Patent Office. Atkins has registered the marks with the United States Customs Service (the "Customs Service"). It petitioned the Customs Service and received an exclusion order on January 4, 1988 under 19 U.S.C. § 1526, that bars the importation of all goods bearing the B & W trademarks without the consent of Atkins.[2]

The amended complaint alleges that Atkins' licensee, B & W–America, and its predecessors have been since 1976 the exclusive United States distributors of loudspeakers manufactured by B & W–UK. Amended Complaint ¶ 5. In that regard, B & W–America has used and widely promoted goods under the B & W marks, advertising through promotional brochures, dealer and consumer trade shows, seminars and training sessions, investing several million dollars for such purposes. Amended Complaint ¶ 6, 8. B & W–America has also caused instruction booklets and warranty cards to be placed into cartons for its B & W–brand loudspeakers sold in the United States. Amended Complaint ¶ 9. Atkins and B & W–America have also established an extensive network of dealers authorized to distribute and sell "B & W" products. The dealers are carefully selected for the quality of their salespeople and sales space and their geographical location.

Atkins alleges in its complaint that defendant Sixth Avenue, which is not an authorized B & W dealer, has imported, advertised, dealt in, and sold loudspeakers bearing the B & W trademarks through its retail stores in the United States since January 1986. Atkins further alleges that the defendant, Sixth Avenue, with full knowledge of Atkins' ownership of the trademarks, has continued to promote and advertise its products to the public with and through the use of plaintiff's B & W marks so as to confuse and deceive purchasers and obtain the acceptance of goods based on the reputation and good-will of Atkins and B & W–America.

Atkins claims that Sixth Avenue's importation and sale of loudspeakers in the United States bearing the B & W trademarks constitutes federal trademark infringement, 15 U.S.C. § 1114, unfair competition, 15 U.S.C. § 1125(a), as well as unfair competition and trademark dilution under the law of New York State. The complaint also contends that the importation of B & W goods constitutes a violation of the Tariff Act, 19 U.S.C. § 1526.

---

**2.** Sixth Avenue has challenged the exclusion order under the premise that Atkins' ownership of the marks falls under the "common control" exception of the Customs Service. *See* 19 C.F.R. § 133.21(c)(2). The Customs Service has withheld judgment on this challenge pending the outcome of this litigation. *See* Letter of Marvin M. Amernick, November 1, 1988.

It is undisputed that the goods sold by Sixth Avenue under the B & W marks were manufactured and lawfully trademarked by B & W–UK. Sixth Avenue provides its own service and warranty for its sale of such loudspeakers. The parties apparently agree that Sixth Avenue used the B & W marks on its invoices as early as November of 1986, and as late as September of 1987. Sixth Avenue advertises the fact that it sells B & W loudspeakers in the New York Times and the Village Voice.

## THE MOTIONS

Atkins moves for summary judgment establishing Sixth Avenue's liability for trademark infringement, 15 U.S.C. § 1114(1)(a). It argues that there is no genuine issue of fact as to any of the essential elements of the cause of action for trademark infringement: that Atkins owns the U.S. trademarks for the B & W marks for loudspeakers and parts thereof, that the registrations are valid and subsisting and uncancelled, that Sixth Avenue has used the marks in United States commerce without Atkins' consent, and that Sixth Avenue's use of the B & W marks is likely to cause confusion.

Sixth Avenue moves to dismiss or for summary judgment, and defends against plaintiff's motion for summary judgment, on numerous grounds:

(i) Sixth Avenue contends that plaintiff is not the owner of the B & W trademarks. It argues that B & W–UK's assignment of the marks to Atkins was an invalid transfer of trademark rights in gross, and that B & W–UK does not exercise sufficient control over the nature and quality of the trademark goods to be the owner of the mark.

(ii) Sixth Avenue contends its sale of speakers under the B & W mark cannot be infringement because the goods are "genuine," having been lawfully trademarked by B & W–UK and therefore cannot cause consumer confusion.

(iii) Additionally, Sixth Avenue moves for summary judgment on its counter-claim for cancellation of the Customs exclusion order. It contends that, because the purported assignment of the marks to Atkins was void, the true owner of the marks is a foreign corporation (either B & W–UK or Equity International); foreign corporations are ineligible for exclusion orders under the Tariff Act. See 19 U.S.C. § 1526(a).

Further, Sixth Avenue moves for partial summary judgment on all infringement claims prior to July 2, 1987, on the grounds that, because the marks were owned by B & W–UK prior to that date, Atkins' rights were not infringed by Sixth Avenue's sales of goods bearing the marks. On this same theory, Sixth Avenue seeks an order *in limine* preventing Atkins from introducing any evidence of infringement prior to that date for purposes of either liability or damages.

Finally, Sixth Avenue seeks summary judgment with respect to the exclusion of its goods by the U.S. Customs Service under the Tariff Act, 19 U.S.C. § 1526.

## DISCUSSION

### 1. *Ownership of the B & W Marks*

Atkins has submitted Registrations from the United States Patent and Trademark Office dated September 8, 1987. These documents establish *prima facie* ownership of the B & W marks. 15 U.S.C. 1057(b). Coupled with continuous use of the marks, by statute, ownership of both marks has become incontestable. 15 U.S.C. §§ 1065, 1115(b). This concept of incontestability was recently examined by the United States Supreme Court, which upheld the use of this presumption by plaintiffs in trademark infringement actions, subject only to certain specified defenses. *See Park'N'Fly, Inc. v. Dollar Park and Fly Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

Although the statute limits which defenses may be asserted to an action asserted by a registrant whose mark had become incontestable, I will assume a liberal construction of the statute permitting consideration of defendant's legal challenges. Sixth Avenue raises several contentions to dispute Atkins' ownership of the B & W marks.

 a. Defendant argues first that the assignment of the marks to Atkins pursuant to the Assignment Agreement was an invalid transfer in gross. It is well settled law that the transfer of a trademark or trade name without the attendant good-will of the business which it represents is an invalid "naked" or "in gross" transfer of rights. *Berni v. International Gourmet Restaurants of America,* 838 F.2d 642 (2d Cir.1988). "A trademark only gives the right to prohibit the use of it so far as to protect the owner's good-will." *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) "Because a trademark is symbolic, it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business, and cannot be transferred separately from the goodwill of the business." *Premier Dental Products Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 853 (3d Cir.1986), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1987), *reh. denied,* 479 S.Ct. 1062, 107 S.Ct. 945, 93 L.Ed.2d 995 (1987); *Pepsico, Inc. v. Grapette Co.,* 416 F.2d 285, 287 (8th Cir. 1969). Although a trademark assignment must be accompanied by the attendant good will, there need not be any transfer of tangible assets. *Hy–Cross Hatchery, Inc. v. Osborne,* 303 F.2d 947 (1962).

The rationale supporting this common-law rule is consumer protection.[3] A trademark identifies the source and quality of the goods and services offered. *See Visa, U.S.A., Inc. v. Birmingham Trust National Bank,* 696 F.2d 1371, 1375 (Fed.Cir. 1982). For a company to purchase the rights to a well-known trademark to use it in a manner which is wholly unrelated to the business or products which made the trademark famous would confuse or deceive the consumer. "Use of the mark by the assignee in connection with a different good-will and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Marshak v. Green,* 746 F.2d 927, 929 (2d Cir.1984).

Consonant with this purpose, courts have recognized exceptions to the general rule that trademarks cannot be assigned without the goodwill of the accompanying business. For example, where there is "continuity of management," so that the assignee will continue to provide the same quality of service, a transfer without good-will is not subject to invalidation. *Marshak v. Green,* 746 F.2d at 930.

The facts in this case do not support the defendant's position. Sixth Avenue's argument seeks to substitute labels for commercial reality. To apply the rule forbidding "naked assignment" of a trademark in these circumstances would ignore the realities of the transaction. It is true that the assignment by B & W–UK to Atkins was technically "naked," if one looks only at that facet of the overall transaction. If, on the other hand, one looks at the overall facts, this is not an assignment that separates the trademark from the goods or services upon which its reputation is based. To the contrary, this was an assignment to a U.S. corporation for business convenience (and perhaps to qualify for a customs exclusion) which is designed to continue the employment of the trademarks in connection with the same goods on which their reputation is based—being the loudspeakers manufactured by B & W–UK.[4] Fur-

---

3. Congress has explained that the two bases of trademark law are "to protect the public so that it may be confident that, in purchasing a product bearing a particular trademark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trademark has spent energy, time and money in presenting to the public the products, he is protected in his investment for its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trademark owner." S.Rep. No. 1333, 79th Cong., 2d Sess. 3, 5 (1946), re-

printed in United States Code Cong. and Ad. News 1274.

4. "The ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement." *Premier Dental Products,* 794 F.2d at 856. *See also Model Rectifier Corp. v. Takachiho International, Inc.,* 220 U.S.P.Q. 508, 510 (C.D.Cal.1982), *aff'd* 709 F.2d 1517 (9th Cir.1983). As both B & W–UK and Joseph Atkins agreed to register the ownership of the B & W marks in Atkins' name, this court finds no reason why such a decision

thermore, B & W–America, the former distributor under B & W–UK's license to Misobanke, with its personnel essentially unchanged, but now related to Atkins, continues to exercise the license to distribute the trademarked goods.

Thus, the Atkins assignment is not a "naked assignment." It continues the association of the trademark with the very goods which created its reputation.[5] And under the "continuity of management" exception recognized in *Marshak,* a viable business continues to operate as licensee of the marks. The public continues to receive the same quality of goods and services which have always accompanied the B & W marks. The assignment to Atkins did not sever the relationship between the mark and the good-will which it had developed in the United States.

■ (b) Defendant Sixth Avenue raises several unavailing challenges to Atkins' enforcement rights in the B & W marks. Relying on Customs Service regulations that deny enforcement of the Tariff Act to a plaintiff who is under common control with the foreign manufacturer-markholder, *see* 19 C.F.R. § 133.21(c)(2), defendant contends Atkins should be found related to B & W–UK and should be denied enforcement of the B & W trademarks. The argument is both factually and legally flawed.

First, Atkins is not under common control with B & W–UK. Atkins and the Equity companies have only a contractual relationship with the British markholder.

Second, even if Atkins and B & W–UK were under common ownership, with the

consequence that Atkins could not invoke the protections of the Tariff Act, *see K-Mart Corp. v. Cartier Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), that would not affect Atkins' right to enforce its trademark under the Lanham Act. *See Vivitar v. United States,* 761 F.2d 1552, 1569 (Fed.Cir.1985); *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). The protection of the Lanham Act, unlike the Tariff Act, 19 U.S.C. § 1526(a), is not limited to United States citizens. *See* 15 U.S.C. §§ 1114, 1124.[6]

■ (c) Defendant next argues that Atkins cannot own the registrations because the English manufacturer, and not Atkins, is recognized as the source of the B & W marks. This argument misperceives modern developments of trademark law. The modern rule does not require that consumers be able to pinpoint an exact source of origin, but merely requires that they recognize products bearing a particular mark are sponsored by a "single, anonymous source." McCarthy, *Trademarks and Unfair Competition,* § 3.3(B) (2nd 1984). "It is of little significance to the establishment of trademark rights whether the public can identify correctly by name the owner of the mark ... What is significant is whether the public perceives the existence of a single commercial entity as the sponsor of the mark, not whether the public can accurately name that entity." *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163, 1179 (S.D.N.Y. 1984). The evidence shows furthermore that the Atkins–Equity group and its predecessor Misobanke expended millions

---

should be disturbed. Although it is not for the court to inquire into the matter, it appears that the decision not to conduct business actively through Atkins was made to avoid subjecting revenues to United States taxation. Atkins Dep. pp. 71–72.

**5.** The assignment of trademarks among related corporate entities is not uncommon. In *Browne–Vintners Co. v. National Distillers and Chemicals Corporation,* 151 F.Supp. 595, 602 (S.D.N.Y.1957), the court was not troubled by a series of transactions in which the "Mumm" trademark for champagne was transferred from the French owner to an American subsidiary, which assigned it to a separate company that was the exclusive distributor of the trademarked

champagne in the United States. The distributor then reassigned the mark back to the New York subsidiary which proceeded to license the trademark back to the distributor. Whether the reason is to avoid nationalization, or for tax or trademark purposes, the court does not "believe that an assignment motivated at least in part by sound business judgment should be set aside as a sham transaction." *Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 678 (7th Cir.1982).

**6.** *Olympus Corp. v. United States,* 792 F.2d 315, 321 (2d Cir.1986); *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1987), which limits the domestic markholder's right to enforce the mark against "genuine" goods obtained abroad is not to the contrary.

in the development of a "separate, tactically independent goodwill" for the B & W marks in this country. *Osawa*, 589 F.Supp. at 1174.

■ (d) Sixth Avenue further argues in opposition to the validity of the assignment that plaintiff Atkins receives no royalties from its license, conducts no business, and gave no real consideration for the assignment. This argument artificially isolates one segment of the complex transaction. Only a year prior to the Assignment Agreement, entities controlled by Joseph Atkins paid several million dollars for the distribution rights in the B & W marks to the principals of Misobanke. The evidence reveals that the eventual assignment of the marks to Atkins was part of a prior agreement made among B & W–UK, Misobanke and various Atkins entities when Equity International bought out Misobanke. Thus although the Assignment Agreement was later in time, it was a formality that was a natural by-product of the real economic transaction. Atkins Dep. pp. 145–146. Because the plaintiff has made a strong showing of having developed a separate goodwill for B & W-marked products in North America, assignment of the registrations can be considered under these facts as only a *pro forma* confirmatory transfer of rights which could be enforced by the exclusive distributor even without the registrations. *See* Callman, *Unfair Competition, Trademarks and Monopolies,* § 17.16 (4th Ed.1981).

(e) Defendant also challenges the Assignment Agreement on the grounds that because B & W–UK retains a reversionary interest in the B & W marks, the assignment is invalid. This argument contradicts fundamental principles of contract and trademark law, which hold that "limitations in an otherwise valid assignment do not invalidate it." *Premier Dental Products,* 794 F.2d at 856. *See Osawa*, 589 F.Supp. 1163, 1178–79 (S.D.N.Y.1984); *In re George J. Ball,* 153 U.S.P.Q. 427 (T.T.A.B. 1967).

■ I find that Atkins has established it is the owner of the B & W marks in the United States, and may properly enforce its rights to those marks in this forum. Defendant has produced no evidence that raises a material issue of fact as to Atkins' right over the marks.

2. *"Genuine Goods" and the Likelihood of Consumer Confusion.*

■ Defendant takes the familiar position that the goods are "genuine," that is, produced and trademarked by the same manufacturer that supplies loudspeakers to Atkins. Because they are "genuine" goods, the defendant argues, there could be no consumer confusion. *NEC Electronics v. Cal Circuit Abco,* 810 F.2d 1506 (9th Cir.1987). *Sassoon Jeans Inc. v. Sasson Jeans L.A. Inc.,* 632 F.Supp. 1525 (S.D.N.Y. 1986); *Monte Carlo Shirt Inc. v. Daewoo International (America) Corp.,* 707 F.2d 1054 (9th Cir.1983).

The Court of Appeals for the Second Circuit recently addressed this question in *Original Appalachian Artworks v. Granada Electronics Inc.,* 816 F.2d 68 (2d Cir.1987). That case considered whether the sale of Cabbage Patch Dolls in the United States could cause consumer confusion that would entitle the U.S. trademark owner to injunctive relief. The court held only that Sixth Avenue's argument "has *some* force in cases where the imported goods are identical to the domestic goods and are intended for sale in the United States." *Id.,* 816 F.2d at 73 (emphasis added). Although the dolls (acquired abroad by defendant) were physically identical to the dolls sold by plaintiff in the United States, the court found that they were not identical because their "adoption papers" (which were part of the package) were in Spanish. Understanding that the dolls had not been produced for sale in the United States, the court found that a likelihood of confusion existed and affirmed the grant of a preliminary injunction.

There is certainly a question of fact whether the B & W loudspeakers sold by Sixth Avenue were intended by the manufacturer for sale in the United States. By contract, B & W–UK has pledged that all of its products for sale in the United States would be sold and distributed by Atkins

and its licensees, as well as subject to quality control inspections. Sixth Avenue admits that all of its supply of B & W-marked loudspeakers were purchased, not from B & W–UK, but from English Discounts, Inc., an American corporation which is not related to B & W–UK.

There is also a question whether the goods are identical. Among differences that may be pertinent are the fact that the defendant's goods did not undergo the inspections designed with reference to the U.S. market and that defendant's goods may be covered by a qualitatively different warranty from those distributed in the U.S. through authorized channels. There may also be physical differences. The submissions of the parties do not clarify these issues.

A clear determination of this issue cannot be made on the present record. A genuine issue of material fact remains as to whether the plaintiff has proven likelihood of confusion. Resolution of this issue requires trial. Summary judgment is not appropriate.

3. *Tariff Act issues*

■ A branch of defendant's motions for summary judgment seeks a ruling barring exclusion of defendant's goods by the Customs Service under the Tariff Act, 19 U.S.C. § 1526. This motion must be denied for several reasons.

First, to the extent the motion depends on defendant's contentions attacking plaintiff's ownership of and right to enforce the B & W marks, these contentions fail for the reasons discussed above.

Second, as to whether Atkins falls under the "common control" exception established by the Customs Regulations, 19 C.F.R. §§ 133.21(c)(2), 133.2(d)(2), the papers submitted fail to show that such "common control" is established. It appears from the plaintiff's submissions that the relationship between B & W–UK and the Atkins entities arises solely from contracts and that there is no common ownership or control.

In any event, to the extent defendant is seeking to bar Customs Service enforce-

ment of its regulation, it appears that such claims must be raised through administrative proceedings, *see* 19 U.S.C. §§ 1514, 1516 and accompanying regulations, with judicial review available upon exhaustion in the Court of International Trade. *See* 28 U.S.C. § 1581, 19 U.S.C. §§ 1514, 1516; *see generally Vivitar*, 761 F.2d at 1557–60; *Olympus*, 792 F.2d at 317–19.

### CONCLUSION

A. Plaintiff's and defendant's motions for summary judgment dispute many of the same issues. Partial summary judgment is granted in favor of the plaintiff on the following issues:

(i) plaintiff is the owner of the United States trademarks for B & W loudspeakers and parts, etc., and may enforce those rights in the United States;

(ii) plaintiff's registrations of those marks are valid, subsisting, and uncancelled;

(iii) plaintiff's ownership has become incontestable under 15 U.S.C. §§ 1065, 1115(b), and

(iv) the assignment of the trademark rights to plaintiff is not void as a "naked" or "in gross" assignment.

B. Summary judgment is denied with respect to the pertinence of an exception for genuine goods and to the likelihood of confusion.

C. All of defendant's motions for summary judgment are denied.

D. Defendant's motion to dismiss the complaint under Rule 12(b)(6) for failure to state a claim is denied.

E. Defendant's motion for summary judgment that plaintiff has no standing to assert rights under the Tariff Act is denied.

SO ORDERED.